**In re NEW YORK CITY SHOES, INC. Debtor.**

**Murray H. GOODMAN, t/a Coventry Mall Associates, a Pennsylvania Limited Partnership, Plaintiff,**

**v.**

**NEW YORK CITY SHOES, INC. Ernest Blumenthal, Roberta Blumenthal, Barnett Nappen, and Marilyn Nappen, Defendants,**

**v.**

**Martin GORODETZER and Sheila Gorodetzer, Additional Defendants.**

Bankruptcy No. 87–03426S.
Adv. No. 87–1087S.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 20, 1988.

Jeffrey S. Saltz, Philadelphia, Pa., for plaintiff.

Stephen F. Ritner, Philadelphia, Pa., for individual defendants.

Kenneth M. Dubrow, Mary F. Walrath, Philadelphia, Pa., for debtor.

Rosetta Packer, Donald Harrison, Philadelphia, Pa., for Creditors' Committee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant adversary proceeding was deposited in our court, despite having only a slight connection with the bankruptcy case of which it is ostensibly a part, after visits to two other forums. It raises several issues of unsettled state landlord-tenant law which we must address in rendering this decision, but we nevertheless must determine this proceeding because the district court has designated it as a core proceeding. We predict that the Pennsylvania Supreme Court, at this juncture, would treat a real estate lease like any other contract, and hold that a landlord has a duty to mitigate damages for loss of rental income by making a reasonable effort to relet a premises after the tenant has vacated it in violation of a lease. We further predict that the Supreme Court would hold that, while the tenant has the initial burden of producing evidence that no reasonable effort at mitigation was made, the landlord would have the ultimate burden of persuasion that he did make a reasonable effort to mitigate damages. Applying these holdings to the facts of the instant case, we conclude that the landlord here has met his burden of proving that damages of only the rentals due on the first day of the month after the date of the tenant's departure, plus rent for sixty (60) days additional thereafter, are reasonable. We therefore shall award the landlord damages of $21,900.27, plus interest from February 1, 1987, and a right to obtain reasonable attorney's fees, the latter being an issue concerning which we urge the parties to resolve between themselves without returning to us.

### B. PROCEDURAL HISTORY

This proceeding was filed on February 20, 1987, in the Court of Common Pleas of Philadelphia County by MURRAY H. GOODMAN, trading as COVENTRY MALL ASSOCIATES (hereinafter referred to as "the Landlord"). The Landlord is the owner of about ten (10) shopping malls, including the Coventry Mall Shopping Center, the site of the store in issue. Named as defendants were the guarantors in a lease to MARTIN GORODETZER and eBn, LTD. (hereinafter collectively "the Tenant"), namely, NEW YORK CITY SHOES, INC. (hereinafter "the Debtor"); and ROBERT BLUMENTHAL, ROBERTA BLUMENTHAL, BARNETT NAPPEN, and MARILYN NAPPEN (hereinafter "the Individual Guarantors"). Damages of $120,369.28 were originally sought, representing the rent arrears, then alleged to be $15,693.28, and $104,676.00 for minimum rent arrears through the balance of the lease term. On April 23, 1987, the Debtor joined MARTIN GORODETZER and SHEILA GORODETZER, who were in turn its indemnitors (hereinafter "the Indemnitors"), as third party defendants.

This action had been stayed by the Debtor's bankruptcy filing on July 7, 1987. Therefore, on August 26, 1987, the Landlord removed the matter to the United States District Court for the Eastern District of Pennsylvania. On September 30, 1987, all of the Defendants joined in filing a Petition requesting the District Court to abstain under 28 U.S.C. §§ 1334(c)(1) and (c)(2) and to remand the matter back to the state court pursuant to 28 U.S.C. § 1452(b). On November 17, 1987, the Honorable James J. Giles of the District Court, finding the matter to "form a core proceeding" in the Debtor's bankruptcy case, "remanded" the matter to us instead. Since this determination was unappealed, we are directed to not only hear the matter but, since it is designated as a "core proceeding," to determine it. See 28 U.S.C. § 157(b)(1).

Ironically, on April 5, 1988, the Debtor and the Indemnitors filed a Stipulation acknowledging the latter's duty to indemnify the Debtor. Also, on February 1, 1988, we approved a sale by the Debtor of virtually all of its assets for approximately $2 million, as a result of which it is not anticipated that any estate funds will be available for distribution to unsecured creditors. See generally In re New York City Shoes, Inc., Richard Royce Collections, Ltd. v. New York City Shoes, Inc., 84 B.R. 947,

952, 960 (Bankr.E.D.Pa.1988). Therefore, the Debtor has little or no value as a target, and no practical interest in this "core proceeding." *Cf. In re Humphreys Pest Control Co.,* 80 B.R. 687, 689 (Bankr.E.D. Pa.1987) (court determined matter removed to this court by a debtor even after the debtor was dismissed from the case).

Upon receipt of the file in this case, noting that discovery had been completed, we set it down for trial on March 22, 1988. The Indemnitors, now the principal target of the action, moved for a continuance, which we granted with the additional provisos of a Pre-trial Order requiring, *inter alia,* that the parties attempt to prepare a Stipulation of undisputed facts and that the trial would definitely take place on April 26, 1988. As it developed, the parties effected a Stipulation of most of the relevant facts and we were treated to but an hour of testimony, mostly from James D. Coppersmith, the Landlord's Vice President of Retail Leasing, whose home base is West Palm Beach, Florida.

At the close of the hearing, we allowed the parties until May 6, 1988, to supplement their rather substantial pre-trial Briefs. We are preparing our decision in the form mandated by Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), although many of the Findings of Fact are drawn from the Stipulation, and some of the Conclusions of Law require somewhat extended discussions.

## C. FINDINGS OF FACT

1. On September 24, 1985, the Tenant entered into a Lease Agreement for Store No. B–11 located in the Landlord's Coventry Mall Shopping Center, North Coventry Township, Chester County, Pennsylvania, proximate to the Borough of Pottstown, beginning on October 1, 1985, and extending through December 31, 1990.

2. The Tenant rented the premises to operate therein a retail shoe store franchised by the Debtor.

3. On June 4, 1986, the Tenant advised the Landlord's agent of their unanticipated financial difficulties in operating the store and requested that the monthly rental be deferred. This request was denied by letter dated June 11, 1986, from Mr. Coppersmith.

4. On October 21, 1986, the Tenant sent a letter to the Landlord advising that its financial difficulties had continued and recommending that the Landlord "may lease this location to others, if possible, and allow us our [sic—probably means "out"] of this lease so that we can pursue a location with less onerous rents and other fees...."

5. Mr. Coppersmith responded by letter dated November 13, 1986, in which he stated, *inter alia,* that "I agree with your efforts to date [?] outlined in your October 21 letter."

6. The Tenant next sent the Landlord a letter dated January 5, 1987, advising that the store's difficulties "are still continuing" and that "since it appears that you have not sought to market this location over the past several months despite our notification, this is an additional request for you to do so."

7. On January 12, 1987, Mr. Coppersmith responded by sending a letter enclosing a form of Option to Terminate Agreement. This Agreement contemplated the Landlord's having the right to terminate the lease on thirty (30) days notice and the Tenant's being liable for rent only through the termination date established through the option, if exercised.

8. The Tenant did not sign and return the form of Option to Terminate Agreement, but, on or about January 19, 1987, it vacated the premises and turned over the keys to the Landlord's management.

9. On January 21, 1987, and January 30, 1987, an agent of the Landlord other than Mr. Coppersmith sent certified letters to the Tenant indicating that its vacating of the premises was in violation of the lease and stating that delinquent rent was owed. The latter letter recited the sum due, as of February 1, 1987, at $15,838.67.

10. At the time that the Tenant vacated the premises, the minimum monthly rental charges were $3,031.30.

11. The premises at the Mall next to the premises leased by the Tenant had been occupied by Schuylkill Valley Sporting Goods West, Inc. (hereinafter "Schuylkill Valley"), pursuant to a lease with the Landlord, since 1983. On or about May 21, 1987, the Plaintiff and Schuylkill Valley entered into an Amendment and Extension of Lease Agreement which included the space formerly occupied by the Tenant.

12. Schuylkill Valley opened for business in the store formerly rented by the Tenant on July 24, 1987, and began paying rent pursuant to the Lease Amendment including the Tenant's former store as of that date.

13. Martin Gorodetzer was the only witness called by the Defendants. His only testimony was that neither he nor anyone connected with the Tenant either saw or heard anything which evidenced that the Landlord was attempting to re-rent the premises at any time and that no prospective tenant ever came to look at the store.

14. Mr. Coppersmith testified at length regarding his general leasing strategy, which is to market each mall and all of the malls operated by the Landlord in a package, contacting large retailers on a periodic, on-going basis concerning their needs.

15. Mr. Coppersmith could recall virtually no details regarding his specific efforts to re-rent the premises leased by the Tenant, but repeatedly stated that he "generally" and "probably" "would have" made efforts to find another tenant for this store as part and parcel of all of his marketing efforts from June, 1986, through May, 1987.

16. Mr. Coppersmith stated that he had done no advertising; discouraged the mall manager, whom he stated was a poor salesman, from trying to lease the store; and could identify no other party whom he specifically marketed for this store other than Schuylkill Valley, which of course had been proximate to the location at all relevant times.

17. Finally, Mr. Coppersmith testified that two new tenants had moved into the mall between October, 1986, and April, 1987, but that they were a restaurant and a hair stylist which he believed were not suitable tenants for this store and hence were not solicited for it.

18. Both Messrs. Coppersmith and Gorodetzer were generally credible witnesses. However, Mr. Coppersmith was unable to identify any specific actions taken by the Landlord at any time to re-rent the store.

19. We therefore find that the Landlord made no particular efforts to re-rent this store; rented it only when the prospect was at its doorstep; and thus made only a half-hearted effort to mitigate damages.

## D. CONCLUSIONS OF LAW

### 1. The Pennsylvania Supreme Court Would Be Likely to Recognize a Landlord's Duty to Mitigate Damages Arising From a Tenant's Vacating Rented Realty

Given the effort that any practical landlord would naturally make to re-rent a vacated premises, it is somewhat surprising to note that there is "pronounced disagreement ... as to whether a landlord has a duty to accept or procure a new tenant for the purpose of mitigating damages recoverable from a tenant who, prior to the expiration of his term, has abandoned or failed to occupy premises under a lease or tenancy." Annot., *Landlord's Duty, on Tenant's Failure to Occupy, or Abandonment of, Premises to Mitigate Damages by Accepting or Procuring Another Tenant,* 21 A.L. R.3d 534 (1968). Even more surprising is that the Pennsylvania appellate courts have only addressed the issue two times, on each instance in dictum, and suggested contrary results.

In *Auer v. Penn,* 99 Pa. 370 (1882), the Court soundly rejected a tenant's argument that a tenant could relieve himself of a tenancy by simply vacating the premises and sending the key to the landlord. The court, however, went on to say that "[t]he landlord may allow the property to stand idle, and hold the tenant for the entire rent; ..." *id.* at 375–76, thus rejecting any notion of a landlord's duty to mitigate damages in any circumstances.

However, in *Ralph v. Deiley,* 293 Pa. 90, 95, 141 A. 640, 643 (1928), the same court, while approving the *Auer v. Penn* holding, states that, if a landlord undertakes to rent a premises, he "should be reasonably diligent in securing a desirable tenant for the best rent obtainable to minimize the first lessee's loss: ..."

Taken together, these two passages of dicta suggest an anomalous result. The landlord has no duty to attempt to re-let at all, but, if he does make such attempt, then and only then does he submit himself to the possibility of having his damages mitigated because he failed to exercise reasonable diligence in re-renting the premises.

The rationale usually given for the *Auer* rule is that a leasehold is a purchase of an interest in realty which must be treated differently from a contract involving personalty. Annot., *supra,* 21 A.L.R.3d at 548–49. However, the Pennsylvania Supreme Court has recently displayed a distinct distaste for applying such doctrines which developed in "primarily agrarian society" to contemporary landlord and tenant law, like the refusal of the common law to recognize an implied warranty of habitability of rental properties. *Pugh v. Holmes,* 486 Pa. 272, 280, 405 A.2d 897, 901 (1979). Thus, in *Pugh,* the Court held "that a lease is in the nature of a contract and is to be controlled by contract law." 486 Pa. at 284, 405 A.2d at 903. This principle has been reiterated in numerous contexts, including the treatment of leases under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 et seq., which protects consumers from fraudulent and deceptive practices in consumer contracts. *See Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 457–78, 329 A.2d 812, 815–26 (1974); *Gabriel v. O'Hara,* 368 Pa.Super. 383, 534 A.2d 488, 491–93 (1987); and *In re Aponte,* 82 B.R. 738, 746–47 (Bankr.E.D.Pa.1988). The "principles of contract law" have been invoked to determine whether there has been an anticipatory breach of a lease contract. *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies of Greater Philadelphia,* 319 Pa.Super. 228, 236, 466 A.2d 132, 136 (1983). It has also resulted in the destruction of such common law principles as the refusal to release a tenant from liability upon the destruction of the premises, *Albert M. Greenfield & Co. v. Kolea,* 475 Pa. 351, 380 A.2d 758 (1977); the validity of clauses exculpating landlords from liability for injuries to tenants for defective conditions on premises, *Reitmeyer v. Sprecher,* 431 Pa. 284, 243 A.2d 395 (1968); and use of self-help, extra-judicial remedies. *See Santiago v. McElroy,* 319 F.Supp. 284 (E.D.Pa.1970) (three-judge court) (rent distraint); and *In re Adams,* 65 B.R. 646, 649 (Bankr.E.D.Pa.1986); and *Kuriger v. Cramer,* 345 Pa.Super. 595, 607–08 n. 14, 498 A.2d 1331, 1337 n. 14 (1985) (self-help eviction).

█ We note that the appellate courts of several states have overruled prior decisions which had established that a landlord had no duty to mitigate his damages upon a tenant's departure from a leased premises. *Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767 (1977); and *Wright v. Baumann,* 239 Or. 410, 398 P.2d 119 (1965). We feel quite certain that the Pennsylvania Supreme Court, if confronted with the question, would follow these courts and revise the rule set down in the "agrarian society" times of *Auer v. Penn.* We believe that the court would apply "contract law" principles to this issue, as it has done in so many other areas touching on landlord-tenant law. Under general principles of contract law, there is clearly "a general rule [that] a party cannot recover damages for loss that he could have avoided by reasonable efforts," RESTATEMENT (SECOND) OF CONTRACTS, § 350, comment b, at 127 (1981), i.e., mitigation of damages is a defense.

2. *The Tenant has the Burden of Producing Evidence of the Landlord's Failure to Mitigate Damages, But the Landlord has the Ultimate Burden of Persuasion That He Took Reasonable Measures to Mitigate Damages*

Aware of this court's statement, at trial, that the Landlord's failure to mitigate damages may constitute a defense, the parties

nevertheless vigorously dispute the relative burdens of proof of the parties on this issue. We believe, however, that this confusion arises, in large part, from the failure of many of the pertinent authorities to sort out the distinction between the burden of producing evidence on an issue and the burden of ultimate persuasion on that issue.

This distinction is one which this court has addressed in several contexts. For instance, in determining which party has the burden of proof in the determination of whether a Chapter 13 plan comports with 11 U.S.C. § 1325(b)(1)(B), both judges sitting in this station of the court have concurred that, while the creditor bears the initial burden of producing evidence to support such an objection to a Chapter 13 plan, the debtor bears the ultimate burden of persuading us that a plan satisfies the § 1325(b)(1)(B) requirement. *See In re Crompton*, 73 B.R. 800, 808–09 (Bankr.E.D.Pa.1987); *In re Fries*, 68 B.R. 676, 682–86 (Bankr.E.D.Pa.1986); and *In re Gathright*, 67 B.R. 384, 391 (Bankr.E.D.Pa.1986), *appeal dismissed*, 71 B.R. 343 (E.D.Pa.1987). This result is explained by the fact that, as between the debtor and the creditor, it is the creditor who must put an objection in issue, but it is the debtor who has superior knowledge about the issue of, and access to proof of, his own income and expenses. *Crompton, supra*, 73 B.R. at 809; *Fries, supra*, 68 B.R. at 685; and *Gathright, supra*, 67 B.R. at 391.

Similar reasoning has been applied by us in other contexts. In the process for determining the validity of proofs of claim against the debtor's estate, we require the objecting party to produce some evidence supporting the objection, but, upon production of same, thrust the burden of proving the validity of a claim upon the claimant. *In re Lewis*, 80 B.R. 39, 40–41 (Bankr.E.D.Pa.1987). Similarly, in determining whether a debtor has a legitimate reason for discriminating against similarly-situated creditors in a plan, the burden of persuasion is placed upon the debtor, who is best able to prove the logical basis for any such discrimination. *In re Furlow*, 70 B.R. 973, 978 (Bankr.E.D.Pa.1987).

We detect the same dichotomy between burden of producing evidence and burden of ultimate persuasion in the cases discussing the issue of burden of proof on the issue of mitigation of damages. On one hand, the party invoking such a defense has the burden of producing evidence tending to show that conduct resulting in mitigation of damages should have taken place. *See, e.g., Anastasio v. Schering Corp.*, 838 F.2d 701, 708–10 (3d Cir.1987); *S.J. Groves & Sons v. Warner Co.*, 576 F.2d 524, 528–29 (3d Cir.1978); *Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank*, 611 F.2d 465, 471 (3d Cir.1979); and *APCL & K, Inc. v. Richer Communications, Inc.*, 241 Pa.Super. 396, 403–04, 361 A.2d 762, 766 (1976). On the other hand, once this initial burden is met, the ultimate burden of proof on the issue of mitigation passes to the party seeking damages. *See Cronan v. Castle Gas Co.*, 354 Pa.Super. 381, 389–90, 512 A.2d 1, 4–5 (1986). This allocation of the ultimate burden is particularly appropriate in the context of whether a landlord has made a diligent effort to replace an errant tenant, because the landlord will necessarily have the most knowledge and best means of proof on this issue at his disposal. *See Vawter v. McKessick*, 159 N.W.2d 538, 541 (Iowa 1968); and *Sommer, supra*, 74 N.J. at 457, 378 A.2d at 773.

We therefore conclude that the Pennsylvania Supreme Court, if presented with this further question, would conclude that the tenant has the initial burden of producing evidence on the issue of the landlord's failure to mitigate damages but that, upon such evidence having been produced, the landlord would have the ultimate burden of persuading the court that he has taken sufficiently reasonable actions to mitigate his damages.

*3. The Landlord Here has Persuaded Us That its Efforts Were Sufficient to Justify Recovery of Rent Through Only April, 1987*

We can now measure the facts of the instant case upon the above-articulated sta-

tus of the pertinent law of Pennsylvania on these points. Clearly, the Defendants have produced some evidence of the Landlord's failure to mitigate damages. This issue constituted the primary defense articulated by them in the pleadings and pre-trial briefing. Mr. Gorodetzer presented some evidence of a lack of activity to re-rent the store in issue: lack of prospective new tenants visiting the premises, lack of advertisements, and lack of response to its communications requesting the Landlord to take action to obtain a new tenant. The letters between the parties put the Landlord on notice that the Tenant would most probably be vacating the premises, certainly as early as October 21, 1986, and possibly as early as June, 1986. The Landlord's correspondence indicated full knowledge of the Tenant's plight and an intention to be helpful. Furthermore, the ultimate tenant was right next door all the time, suggesting that the Landlord failed to make a swift and diligent attempt to realize all available possibilities, even one at its very doorstep.

On the other hand, Mr. Gorodetzer presented no evidence of a "smoking gun" in the Landlord's failure to mitigate. He could produce no prospective tenant who had been discouraged from renting the premises, nor did he present any evidence that the Defendants produced any alternative tenants to replace the Tenant who had been rejected by the Landlord.

The strength of the defense therefore rises or falls with the testimony of Mr. Coppersmith. We found Mr. Coppersmith to be courteous and honest, but extremely prone to speak in generalities as to what the Landlord's procedures "would" or "should" have been to re-rent the store in issue rather than what they actually *were* as to this particular store. We do not believe that Mr. Coppersmith's responsibilities are so great that the store in issue was but a speck in the sand about which neither he nor anyone else associated with the Landlord could be expected to recall specifics, as he tended to suggest. We have here a case which the Landlord has pursued through three courts. It can be assumed that the Landlord had the resources available to produce its best witness on the issue of the specific efforts made to re-rent this particular store, having hailed Mr. Coppersmith from West Palm Beach for, ostensibly, that purpose. We are therefore left with the nagging suspicion that no evidence exists to rebut the Defendants' inference that the Landlord did nothing in particular to rent this specific store until the tenant next door almost fell into its arms. This suspicion is reinforced by the swiftness with which the Landlord commenced suit, naming the presumably deep-pocketed Debtor as the first-named defendant, and entering the lease with Schuylkill Valley only on the eve of the demise of this presumably deep-pocketed party in bankruptcy.

We emphasize that these are only suspicions. They are not strong enough to cause us to deny the Landlord from recovery of any damages. Rather, they temper our willingness to award the Landlord any but the damages which most clearly resulted from the Tenant's breach.

We believe that the Landlord is clearly entitled to rent through February, 1987, which is only a short time after the Tenant actually left. We do not detect any reason articulated by the Tenant for disputing this conclusion. For example, no argument was made that the Tenant delayed its departure while awaiting the Landlord's obtaining a replacement-tenant. The parties apparently agree that the rent for the period through February 1, 1987, is properly calculated at $15,838.67.

■ We have decided to allow the Landlord additional damages in a sum equal to rent for a period of only sixty (60) days more, an increment of $6,062.60. We arrived at this measure of damages by taking into account two factors: (1) The unconsummated offer of the Option to Terminate Agreement provided the Landlord with a 30–day notice of termination. This period is thus apparently the normal lapse period that the Landlord expected to pass until it was able to install a replacement tenant once it had located that replacement. We fail to see why finding a replacement

should have taken more than thirty (30) days after the Tenant's departure, had the Landlord actually engaged in a concentrated effort to re-rent *this* store; and (2) This was the approximate lag-time between Schuylkill Valley's signature of the Amendment which resulted in its renting the Tenant's former store and the time that it opened for business in the new location. We suspect that the Landlord was concerned with placating Schuylkill Valley on the short term, and therefore allowed it considerable leeway as to when that party had to commence rent payments. We believe that, if operating in a truly pressured environment, the Landlord could have "found" Schuylkill Valley and enlisted it as a paying tenant in the Debtor's store within sixty (60) days.

We do not think that any other damages are warranted. We shall therefore measure the Plaintiff's damages at $15,868.67, plus $6,062.60, or $21,900.27.[1]

### 4. The Landlord May Also Recover Reasonable Attorney's Fees

■ The guarantees under which the Landlord brought suit entitle it to "without limitation, all attorneys' fees incurred by Landlord or counsel by any ... default and/or by the enforcement of this Guaranty." This sweeping language will be enforced by us only to the extent that the fees requested are reasonable, taking into account all of the attendant circumstances. *See In re Smith,* 76 B.R. 426, 430–32 (Bankr.E.D.Pa.1987); and *In re Nickleberry,* 76 B.R. 413, 420–23 (Bankr.E.D.Pa. 1987).

We urge the parties to resolve this matter and avoid further proliferation of this already-overextended litigation. We remind the Landlord that, if the Tenant offered an amount approaching the sum that we ultimately awarded, very little compensation would be deemed to be due by us for legal services performed subsequent to the time of such an offer. On the other hand, if the Tenant offered little or nothing to the Landlord at any time, compensation for most services performed would be in order.

### E.  CONCLUSION

An Order consistent with this Opinion will be entered.

### ORDER

AND NOW, this 20th day of May, 1988, after trial of the above entitled matter on April 26, 1988, and review of the parties' Briefs, it is hereby ORDERED as follows:

1. Judgment is entered in favor of the Plaintiff, MURRAY H. GOODMAN, t/a COVENTRY MALL ASSOCIATES, a Pennsylvania Limited Partnership, et al., and against the Defendants, NEW YORK CITY SHOES, INC., ERNEST BLUMENTHAL, ROBERTA BLUMENTHAL, BARNETT NAPPEN, and MARILYN NAPPEN, in the amount of $21,900.27, plus reasonable attorney's fees and costs.

2. Judgment is entered in favor of the Defendants, NEW YORK CITY SHOES, INC., ERNEST BLUMENTHAL, ROBERTA BLUMENTHAL, BARNETT NAPPEN, and MARILYN NAPPEN, against the Additional Defendants, MARTIN GORODETZER and SHEILA GORODETZER, as indemnification for any sums paid by the Defendants to the Plaintiff pursuant to paragraph one hereof.

3. The parties are directed to confer to resolve the issue of attorney's fees due to the Plaintiff's counsel, but, if they are unable to do so, and the Plaintiff has made a reasonable demand, the Plaintiff's counsel is accorded an opportunity to file a Motion requesting attorney's fees and costs, including compensation on the fee application, same to be filed within thirty (30) days hereafter and to be procedurally in con-

---

1. Our analysis does not require us to determine whether or at what point there was an anticipatory breach of the lease contract by the Tenant, an issue concerning which the parties devoted considerable attention. It does not, however, appear that an "absolute and unequivocal refusal to perform" arose prior to the Tenant's actual-ly vacating the premises. *See 2401 Pennsylvania Ave., supra,* 319 Pa.Super. at 237, 466 A.2d at 136. We therefore hold that the Tenant is liable for all rents due through the month after it vacated the premises, plus the 60–day period thereafter.

formity with *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir. 1975); and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D.Pa.1987).